FILED
2012 Jun-19  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **DARLENE DAUGHERTY,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **v.** | ]    **1:10-CV-2092-KOB** |
| | ] |
| **MAPCO EXPRESS, INC.,** | ] |
| | ] |
| **Defendant.** | ] |

**<u>MEMORANDUM OPINION</u>**

This matter comes before the court on Defendant MAPCO Express, Inc's Motion for

Summary Judgment (doc. 29) and Plaintiff Darlene Daugherty's Motion to Strike the Affidavit of

Mike Terrell (doc. 35), which she filed contemporaneously with her brief opposing MAPCO's

motion for summary judgment (doc. 34). MAPCO moves for summary judgment on Ms.

Daugherty's Title VII claim that she was terminated based on gender. MAPCO argues that Ms.

Daugherty contractually released any Title VII claims when MAPCO terminated her, and,

alternatively, that she cannot prove her case on the merits. The parties have fully briefed the

issues and the motions are ripe for consideration. For the reasons stated below, the court

concludes that the  release is valid and enforceable, and, accordingly that summary judgment is

due to be GRANTED. In granting summary judgment, the court further concludes that the

motion to strike is due to be DENIED, and MAPCO's request for attorneys' fees pursuant to the

severance agreement is also due to be DENIED.

**I.      BACKGROUND AND PROCEDURAL HISTORY**

Ms. Daugherty filed this lawsuit alleging that MAPCO violated her rights under Title VII

by terminating her employment because of her gender. MAPCO responded to her complaint with a motion to dismiss, or, alternatively, motion for summary judgment (doc. 5), asserting that Ms. Daugherty's claim was barred by a release she signed as part of a six-month severance package she received when MAPCO terminated her employment. Ms. Daugherty filed a response (doc. 11) raising the contractual defense of fraud in the inducement and arguing that she did not knowingly and voluntarily execute the release.  Alternatively, she argued that even if the release were enforceable, her claims did not "arise" until after she executed the severance agreement, and, therefore, were expressly exempted from the release.

The court denied MAPCO's motion to dismiss (docs. 14 & 15), explaining that allegations of fraud and a *bona fide* contractual dispute are fact-intensive by nature, and that MAPCO's arguments for dismissal were not ripe at that stage of the proceedings. The court stated that MAPCO could reassert its argument after the parties had adequate opportunity to engage in discovery.

The parties have since completed discovery, and MAPCO filed its motion for summary judgment. MAPCO argues that the court should enter judgment in its favor because the release bars her claim, or, alternatively, because the evidence does not support Ms. Daugherty's claim. Ms. Daugherty maintains that MAPCO procured the release by fraud and that her claims arose after she signed the release. She also asserts that she has sufficient evidence of gender discrimination.

## II.    STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present

and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)   In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its]

3

own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324

(quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963

Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment

procedure is to pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial."). The moving party need not present evidence in a form admissible at

trial; "however, he may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324. If the

evidence is "merely colorable, or is not significantly probative, summary judgment may be

granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the nonmoving

party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988). The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed

in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The nonmoving

party "need not be given the benefit of every inference but only of every reasonable inference."

*Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to

be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the

4

motion for summary judgment, the court must grant the motion *if* no genuine issues of material

fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

## III.   STATEMENT OF FACTS

In a motion for summary judgment, the court construes the facts in the light most

favorable to the non-movant, who is given the benefit of every reasonable inference. The court

states these facts in that light.

*A.   Background facts*

In 2004, Ms. Daugherty began working for MAPCO, an operator of retail fuel and

convenience stores. During the entire time she worked for MAPCO, and for some years before,

she resided in Lineville, Alabama. Before working for MAPCO, Ms. Daugherty worked for

MAPCO's predecessor, Williamson Oil, starting in 1996. While at Williamson Oil, she held

several positions, including Store Manager and Supervisor. Ms. Daugherty eventually requested

to return to working as a Store Manager, alleging that she made the request because Mike Terrell,

Williamson Oil's Loss Prevention Manager, "was riding [her] majorly, and it wasn't worth the

stress levels." Depo. Darlene Daugherty 40:2–40:6.

When Ms. Daugherty started at MAPCO in 2004, she worked as a Store Manager. In

2006, MAPCO promoted her to Regional Training Coordinator. She later worked briefly as a

representative for MAPCO's Fleet Advantage credit card before moving into a position classified

as District Manager in Training ("DMIT"), her final position with MAPCO before she was

terminated. According to Mr. Terrell, who became Director of Loss Prevention when MAPCO

acquired Williamson Oil, the primary purpose of the DMIT position is to "to train . . . an

individual that's been selected for promotion to district manager." Depo. Mike Terrell 20:5–20:8.

Mr. Terrell explained that "generally . . . if it's budgeted, they try to keep . . . someone there in case [MAPCO] has a vacancy." Ms. Daugherty emphasizes that while at Williamson, she worked as a Supervisor, a position equivalent to MAPCO's District Manager.

According to MAPCO's organizational chart, District Managers are responsible for the stores in their district and work under Division Managers. The Division Managers work under a Director of Operations, and the Directors of Operations and Mr. Terrell report to the Executive Vice President and Chief Operations Officer, Lyn Gregory.

Ms. Daugherty states that around the time she became a DMIT, another District Manager in Alabama, Diane Scott, had "a lawsuit with another employee, and they assumed that she would not be working there much longer . . . ." Depo. Darlene Daugherty, 81:9–81:11. Thus, Ms. Daugherty asserts that by moving her into the DMIT position, "they began the process of [Ms. Daugherty's] taking [Ms. Scott's] position."

Ms. Scott, however, did not leave MAPCO while Ms. Daugherty worked there. During Ms. Daugherty's time as a DMIT she did "whatever they needed [her] to do," including resetting stores,[1] reviewing profit and loss statements, providing responsible vendor training on alcohol sales, training store managers on checking in groceries, organizing division meetings, and performing on-site evaluations when district managers were unable to perform the evaluations themselves. *See* Depo. Darlene Daugherty 83:9–90:2. While Ms. Daugherty was a DMIT, a new Division Manager, Gregory Tate, took over the Alabama Division. Ms. Daugherty claims that

---

[1] Although the parties did not explain what it meant to "reset a store," the court infers, from its review of the depositions, that resetting a store involves changing the merchandise and marketing materials, either when MAPCO acquires a new store or engages in a new promotion. *See* Depo. Mike Terrell 109:10–109:15 ("This particular assignment, merchandising stores, stores fail or prosper based upon the way the merchandise is positioned so that it will spur impulse buying, things of that nature.").

when Mr. Tate took over the division, "he was grooming [her] to take over [Ms. Scott]'s position." Depo. Darlene Daugherty 85:11–85:12.

B.    *Mr. Tate's termination, Mr. Terrell's taking over as acting division manager, and Ms. Daugherty's termination*

On March 19, 2009, MAPCO terminated Mr. Tate from his position as Division Manager for the Alabama division, and Mr. Terrell, MAPCO's Loss Prevention Specialist, took over as acting Division Manager on a temporary basis at the request of Executive Vice President and COO, Mr. Gregory. When Mr. Terrell took over, he was told that the company had decided to change its organizational structure and have two Directors of Operations—a Director of Operations East and Director of Operations West—instead of one Director of Operations responsible for the entire chain of stores. As part of this restructuring, Mr. Terrell was told to "cut as much overhead as [he] could from the budget, from the salaries, in order to fund the salary for the [Director of Operations East]." Depo. Mike Terrell 18:21–19:1.

The same day that MAPCO terminated Mr. Tate, Mr. Terrell called a meeting that included the District Managers, a [store] Manager in Training ("MIT"), Ms. Daugherty, and other administrative employees. At the meeting, held at MAPCO's Alabama Division office in Fort Payne, Mr. Terrell announced Mr. Tate's departure and asked each of the employees present to explain their job duties. Mr. Terrell also told the employees present that he would have individual meetings with the employees to discuss their positions and to get additional input.

Mr. Terrell's individual meeting with Ms. Daugherty and his dicussion about her willingness to relocate

When Mr. Terrell had his individual meeting with Ms. Daugherty, he asked her to describe her duties in more detail. Mr. Terrell explained that his impression from his

conversation with Ms. Daugherty was that "she was doing . . . basically administrative sorts of

responsibilities" and "assisting Greg Tate in a variety of matters," in addition to working on

updating or renewing beer licenses.

 In evaluating Ms. Daugherty's utility as a DMIT, Mr. Terrell also asked Ms. Daugherty

about her willingness to relocate if a District Manager positioned opened up, to which Ms.

Daugherty responded that she was not willing to relocate. Although the parties do not dispute

Ms. Daugherty's answer, they do dispute how Mr. Terrell phrased this question. MAPCO,

relying on Mr. Terrell and Mr. Gregory's depositions, asserts that Mr. Terrell had only asked Ms.

Daugherty if she were willing to move. Mr. Terrell explained that he asked that question because

he knew Ms. Daugherty lived in the "far south part of [MAPCO's] geographic territory" and

because he wanted to know whether "she would be willing to take a promotion if it meant

moving somewhere else." Depo. Mike Terrell 34:13–34:17. Ms. Daugherty's termination letter,

dated March 26, 2009 and signed by Mr. Terrell, also supports MAPCO's position; it states:

"During our meeting last week when I asked whether you would accept a promotion to District

Manager if an opening occurred, your response was that you would do so only if you did not have

to move." Ex. D to Def. Br. S.J.

 Ms. Daugherty, relying on her declaration and deposition, claims that Mr. Terrell did not

simply ask her if she would move, but that he specifically asked if she would move to Tennessee

if a District Manager positioned came open there. In deposition, Ms. Daugherty testified:

> I asked him would my job be in jeopardy, and he asked me if I would move. And I
> told him I would not move for a position, because so many people had been
> terminated that had moved. And he said that he didn't know if a position would be
> coming open in Alabama. And he reiterated again would I move to Tennessee for a
> position, and I told him no. Because I was still under the impression I would be

assuming Diane Scott's responsibilities.

Depo. Darlene Daugherty, 116:17–117:4. *See also* 1st Decl. Daugherty ¶ 3 (Sept. 12, 2010) ("He . . . asked me if I would move to Tennessee if a District Manager Position came open there. I told him I would not move to Tennessee.").

Mr. Terrell specifically denied asking Ms. Daugherty to move outside Alabama, because "[a] person who's hired for a position within the division is trained on the division budget," and he could not imagine a division manager would let that person leave and go work at a different division. Depo. Mike Terrell, 46:6–46:11. Nevertheless, the court concludes that Ms. Daugherty has raised a genuine dispute over how Mr. Terrell phrased his question regarding Ms. Daugherty's move. Taken in the light most favorable to Ms. Daugherty, the court must assume Mr. Terrell asked her to move to Tennessee.

Ms. Daugherty's termination, severance package, and release

Because Mr. Gregory instructed Mr. Terrell to cut the overhead budget in his division, and because, according to Mr. Terrell, Ms. Daugherty indicated that she was not willing to move to Tennessee, Mr. Terrell decided to terminate her. Mr. Terrell and Mr. Gregory both assessed that Ms. Daugherty was not adding value in occupying the DMIT position because she was not willing to move if necessary. Mr. Terrell also terminated another female employee, Jenia Miller, as part of his budget cuts, although for different reasons than Ms. Daugherty. *See* Pl. Ex. 18 to Depo. Mike Terrell (e-mail dated March 24, 2009 from Mr. Terrell to other MAPCO employees explaining why he was deciding to terminate Ms. Daugherty and Ms. Miller, and stating that "Jenia is a somewhat different story [from Ms. Daugherty]. She is carried as MIT but lives in O'hatchee and obviously can't run just any store. More importantly, everything I have been told

9

leads me to believe she just does not have the personality to function at a higher level.").

On March 26, 2009, MAPCO officially terminated Ms. Daugherty. MAPCO sent a letter to Ms. Daugherty; after receiving this first termination letter, Ms. Daugherty contacted Kathy Roadarmel, Vice President of Human Resources, and requested that MAPCO make some revisions to the termination letter and put it on company letterhead. The revised letter, which incorporated Ms. Daugherty's requests, was signed by Mr. Terrell and explained that "[t]he driving factor" behind his decision was the need to "reduce a significant amount of salary dollars from the division overhead budget in order to partially fund the salary of the newly created Operations Director East position." Ex. D to Def. Br. S.J. The letter further stated that Ms. Daugherty's unwillingness to move, combined with the small chance that a District Manager position would open up near her, made her of limited utility to MAPCO.

As part of her termination, Ms. Daugherty received a proposed severance agreement and signed a release. MAPCO initially offered Ms. Daugherty a three month severance package, but after she spoke with Ms. Roardarmel, MAPCO raised the severance package to six months of base pay, totaling $21,629.94. As part of Ms. Daugherty's severance package, she signed an agreement explaining that she was agreeing to discharge and release MAPCO from "all claims, obligations, and demands that [she] had, have, or may have arising out of or relating to [her] employment and/or the termination of [her] employment." Ex. G to Def. Br. S.J. ¶ 3. The agreement specifically mentioned Title VII claims as falling within the scope of the release. The agreement also explained that Ms. Daugherty was agreeing to "waive and release any and all claims . . . that [she] had, have, or may have, whether known or unknown, against [MAPCO] for any liability . . . ." Ex. G to Def. Br. S.J. ¶ 4. The agreement stated that "[Ms. Daugherty] shall

have a period of up to twenty-one . . . calendar days in which to consider entering into [the] agreement," and that she "shall have a period of seven . . . calendar days within which to revoke [her] acceptance of [the] agreement." Ex. G to Def. Br. S.J. ¶ 8. The agreement also included a choice-of-law provision, stating that it would be "governed by and construed in accordance with the laws of the State of Tennessee." Ex. G to Def. Br. S.J. ¶ 14.  She executed the agreement on March 31, 2009.

C.    *MAPCO hires C.J. McLaughlin as a DMIT in Alabama*

Preliminary discussions leading to Mr. McLaughlin's hiring

In March of 2009, before Mr. Terrell took over as acting Division Manager and before MAPCO terminated Ms. Daugherty, MAPCO had been considering making some changes within the Georgia and Chattanooga divisions that would have resulted in an opening for district manager. Mr. Terrell discussed with C.J. McLaughlin, a former Loss Prevention Specialist at MAPCO, about possibly returning to MAPCO to potentially fill a District Manager position. At the time Mr. Terrell spoke with Mr. McLaughlin, Mr. McLaughlin was working for U-Haul in Gadsen, Alabama. Mr. Terrell did not give Mr. McLaughlin any specific assurances that he would receive a District Manager position if one became available; but in Mr. Terrell's conversations with Mr. McLaughlin, Mr. McLaughlin confirmed that he was willing to move from his residence in Dutton, Alabama to wherever a District Manager position might become available, even outside Alabama.

Mr. McLaughlin's hiring in April, 2009

MAPCO asserts that it hired Mr. McLaughlin on April 6, 2009. Mr. McLaughlin testified that he thought MAPCO hired him at the beginning of April, 2009, and Mr. Terrell had sent an e-

11

mail to another MAPCO employee on April 6, 2009, stating that "I have hired CJ McLaughlin as DMIT in Alabama. He started today . . . ."

Ms. Daugherty, however, disputes that Mr. McLaughlin was hired in April, relying on a Personnel Action Form MAPCO produced regarding Mr. McLaughlin's rehiring. On that form, Mr. McLaughlin's effective date is typed as *March* 6, 2009, although somebody had scratched out "March" and handwrote "April" above it. The date for Mr. Terrell's signature is typed as March 7, 2009, although Mr. Terrell's signature and the date were not handwritten. At the bottom of the Personnel Action Form is a stamp indicating the form was "Entered" on April 20, 2009. The stamp does not indicate by whom or where the form was entered, although Mr. Terrell speculated, when questioned about the stamp in deposition, that someone in the personnel department received and entered the form on April 20th. Ms. Daugherty argues that, viewing this evidence in the light most favorable to her, the form indicates that Mr. McLaughlin was hired on March 6, 2009, before she was even terminated.

While on the surface Mr. McLaughlin's hire date appears to be dispute of a material fact, the court concludes that this date is not a *genuine* dispute. Mr. Terrell and Mr. McLaughlin both testified that Mr. McLaughlin was hired after Ms. Daugherty was terminated. Mr. Terrell also testified that the Personnel Action Form was a template he kept on his laptop that he would change whenever he needed to effectuate a personnel decision, and that he probably overlooked changing the date when he filled in the form for Mr. McLaughlin and that the dates were probably typos.

The e-mails produced in discovery also refute the date on the Personnel Action Form. Mr. Terrell sent Mr. Gregory an e-mail on March 10, 2009 at 10:50 P.M., explaining that he had

"called CJ McLaughlin [that] evening and he is absolutely ecstatic about the prospect of coming back" and that he had cautioned him "that it is not done until it is done." Pl. Ex. 17 to Depo. Mike Terrell. Ms. Daugherty also did not cite any testimony from any deponent indicating that Mr. McLaughlin started earlier than April, 2009. In light of the timing of the discussions between Mr. Terrell and Mr. McLaughlin, their testimonies, the e-mails between Mr. Terrell and MAPCO employees, and the lack of any evidence corroborating Ms. Daugherty's dispute that Mr. McLaughlin was hired before she was terminated, the court does not find a genuine dispute exists as to Mr. McLaughlin's actual hiring in April.

When MAPCO rehired Mr. McLaughlin, he was classified as a DMIT, although Mr. McLaughlin testified that he personally was not aware he had been classified as a DMIT. He was assigned to assist another MAPCO employee, Joey Harding, with merchandising. According to Mr. McLaughlin, merchandising involved "actually reset[ting] the stores, ma[king] coordination between vendors for displays, axillary [*sic*] end caps." Depo. C.J. McLaughlin 38:19–38:21. Assisting Mr. Harding was Mr. McLaughlin's sole job duty for the first two months of his employment. Accordingly, MAPCO asserts that Mr. McLaughlin "was classified as a DMIT for payroll purposes, even though he did not perform DMIT duties." Def. Br. S.J. at 7.

The record is unclear, however, as to what exact purpose Mr. McLaughlin was serving in his work with Mr. Harding. Mr. McLaughlin stated that he understood he would be working for Mr. Harding until the realignment of the Georgia and Chattanooga divisions, while Mr. Terrell stated that the District Manager position coming out of the realignment never came to fruition, for reasons he could not remember.

Ms. Daugherty, thus, disputes that Mr. McLaughlin did not perform DMIT duties, and the

court finds this dispute has some merit.  Mr. Terrell's deposition testimony indicates that the role of a DMIT varied depending on the individual. *See* Depo. Mike Terrell 109:3–109:7 ("Well, district manager training, that role would, would actually be tailored a little different with each . . . individual based on their knowledge of the industry and their knowledge of MAPCO."). Mr. Terrell explained that one of the advantages of rehiring Mr. McLaughlin was that "he already understood MAPCO's reporting systems and the way [MAPCO] does business." Depo. Mike Terrell 109:8–109:10.  Mr. Terrell speculated that part of the reason Mr. McLaughlin was helping Mr. Hardy was so that Mr. McLaughlin could "get in sync with our . . . then current merchandising plan." And as Ms. Daugherty points out, she also had stated in deposition that one of her job responsibilities was resetting stores.

Moreover, even if Mr. McLaughlin himself was not aware that he was hired as a DMIT, the evidence establishes that Mr. Terrell intended for him to be in that position. In fact, Mr. Terrell expressly indicated this intent in deposition:

> Q: And, and do I infer correctly that you wanted to hire [Mr. McLaughlin] as DMIT to sort of get some training to get back up to speed?
> A: Yeah. He had been gone for two or three years, there had been obviously some changes in that period of time, so common sense would indicate that I would need to have a period there where he could refresh his skill set prior to actually taking responsibility for the district she was vacating.

Depo. Mike Terrell 75:9–75:19. He also stated in deposition that Mr. McLaughin "was taking [Ms. Daugherty]'s role. The position that [MAPCO] eliminated as part of the cost cutting was the DMIT." *See* Depo. Mike Terrell, 118:12–118:15. In an e-mail Mr. Terrell sent to Vice President of Human Resources, Kathy Roadarmel, Mr. Terrell also stated that Mr. McLaughlin "occupies the vacancy left by [Ms. Daugherty]." Pl. Ex. 16 to Depo. Mike Terrell at 2.

Accordingly, viewing this evidence in the light most favorable to Ms. Daugherty, the court

assumes, for the purpose of this opinion, that Mr. McLaughlin was not a DMIT solely for payroll purposes, but in fact was hired to fill Ms. Daugherty's DMIT position.

During the time period that Mr. McLaughlin was assisting Mr. Harding, Jenia Miller, the other employee Mr. Terrell decided to terminate while acting Division Manager, saw Mr. McLaughlin working at a MAPCO store. His return to MAPCO stores in Alabama, after she had been fired, prompted her to contact Ms. Roadarmel, Vice President of Human Resources. Ms. Miller also relayed what she saw to Ms. Daugherty and told her, in late April, that Mr. McLaughlin had assumed Diane Scott's District Manager position.

D.   *District Manager Diane Scott's departure from MAPCO and Mr. McLaughlin's promotion to her position*

Ms. Scott, however, did not resign from her District Manager position until June 2, 2009. Ms. Scott decided to resign because the job had become very stressful and because close family members were having serious medical problems at home. At the time of her resignation, Ms. Scott was managing an area centered around Pell City, Alabama. Sometime before she resigned, Ms. Scott had filed a lawsuit against MAPCO alleging gender and age discrimination, and violation of the Equal Pay Act.  Ms. Scott settled her case with MAPCO in April, 2009.

Shortly after Ms. Scott resigned, Mr. McLaughlin was called to Nasvhille to meet the Alabama Division Manager, Rusty Hagenbuch, and the Director of Operations East, Don Muscatell. They informed Mr. McLaughlin that Ms. Scott had resigned and that they were assigning Mr. McLaughlin her District Manager position. Mr. McLaughlin testified that before his conversation with Mr. Hagenbuch and Mr. Muscatell, he had never spoken with anybody about taking over Ms. Scott's position.

The timing of Ms. Scott's resignation, of Mr. Terrell's awareness of her resignation, and of

Mr. McLaughlin's hiring is the core dispute in this case. Ms. Scott stated in deposition that she did not start thinking about resigning until "somewhere around mid-May," and that she did not tell anybody at MAPCO about her plans to resign before June 2, 2009. *See* Depo. Diane Scott, 20:22–21:15. Thus, MAPCO asserts that Mr. Terrell could not have known about Ms. Scott's departure when he terminated Ms. Daugherty or before he hired Mr. McLaughlin.

Ms. Daugherty disputes that Mr. Terrell was unaware of Ms. Scott's intent to resign before June 2, 2009, based on Mr. Terrell's deposition testimony. Mr. Terrell stated in deposition that "[Ms. Scott] told me she was leaving and then I knew I had an opening, I had an issue to deal with, so I hired [Mr. McLaughlin]." Depo. Mike Terrell, 99:12–99:15. Mr. Terrell also stated that his discovery that Ms. Scott was leaving prompted him to hire Mr. McLaughlin. *See* Depo. Mike Terrell, 7:21-71:23 ("I put [Mr. McLaughlin] in a DMIT position in Alabama because I found out that [Ms. Scott] was leaving.").

Notwithstanding the contradiction between Mr. Terrell's deposition testimony and Ms. Scott's deposition testimony, Mr. Terrell made clear throughout his deposition that he was never aware of Ms. Scott's plans to leave the company before MAPCO terminated Ms. Daugherty. Ms. Daugherty disputes these statements as well, stating in a Declaration she provided after the close of discovery that "[s]ometime in November or December of 2008 or January of 2009, I was at a marketing meeting attended by Mike Terrell, Greg Tate, and many others in MAPCO management . . . . There, I heard Mike say to Greg that Diane Scott would not be around much longer and that they would not have to worry about her." 2d Decl. Daugherty ¶ 4 (Jan. 31, 2012).

Mr. Terrell also submitted an affidavit after the close of discovery on January 5, 2012, where he states that "[u]pon review of the events, it is evident that some of my testimony was

mistaken as it related to the chronology of events." Specifically, Mr. Terrell states that he was mistaken when he testified that he hired Mr. McLaughlin to replace Diane Scott, and that he was mistaken to the extent he testified he was aware of Ms. Scott's resignation before June 2, 2009.

## IV.    MOTION TO STRIKE

Ms. Daugherty moves to strike Mr. Terrell's affidavit, arguing that "it completely contradicts his prior deposition testimony" and that "what [Mr. Terrell] is saying is that other MAPCO witnesses gave later testimony that is different from his, and which coincidentally is better for MAPCO, so he must have been mistaken." Pl. Mot. Strike Aff. Mike Terrell at 1. The court first notes that it did not rely upon Mr. Terrell's affidavit in concluding that MAPCO did not fraudulently induce Ms. Daugherty to sign the release. The court will nevertheless address the motion to further develop the evidence in this case, particularly in the areas most hotly disputed by the parties.

*A.    Standard of Review*

The Eleventh Circuit has held that "a party cannot give 'clear answers to unambiguous questions' in deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987). When a party does so, "the court may disregard the affidavit as a sham." *Rollins*, 833 F.2d at 1530. The Eleventh Circuit clarified that courts are to "*apply this rule sparingly* because of the harsh effect this rule may have on a party's case," because allowing "every failure of memory or variation in a witness' testimony to be regarded as a sham would require far too much from lay witnesses and would deprive the [jury] the traditional opportunity to determine which point in time and with which words the affiant was stating the truth." *Rollins*, 833 F.2d at 1530 (emphasis

17

added). To disregard an affidavit, the court must find "some inherent inconsistency" between the deposition testimony and the affidavit. *Rollins*, 833 F.32d at 1530.

B.    *Discussion*

The court has carefully reviewed the deposition testimony and concludes that inherent inconsistencies exist between the deposition testimony and the affidavit. Mr. Terrell's deposition testimony is inconsistent with his affidavit on two points: (1) that he did not hire Mr. McLaughlin to replace Diane Scott; and (2) that he was not aware of Diane Scott's resignation before he hired Mr. McLaughlin.

Although Mr. McLaughlin maintained throughout his entire deposition that he was expecting to move up to a District Manager position in the Georgia or Chattanooga divisions before he was finally assigned to Ms. Scott's district in Alabama, Mr. Terrell stated a different reason for hiring Mr. McLaughlin:

> Q: Okay. But then you say that [the District Manager position in Georgia or Chattanooga] didn't come to fruition; is that right?
> A: That's correct.
> Q: Why is that?
> A: I don't remember.
> Q: Was it because of the Muscatell deal?
> A: I just don't remember the circumstances.
> . . . .
> Q: Okay. But then [Mr. McLaughlin] was ultimately rehired; is that correct?
> A: That is correct.
> Q: Okay. And in what position was he rehired in?
> A: I put him in a DMIT position in Alabama because I found out Diane [Scott] was leaving.
> . . . .
> Q: Okay. So then she told you that she was going to be leaving and then you try to talk her out of it; is that correct?
> A: Correct.
> . . . .
> Q: Okay. So when she told you that she was leaving, you had the idea, hey, this is a job [Mr. McLaughlin] could have; is that right?

A: Well, when she told me that she was leaving, I was facing a dilemma. I had nobody to fill that slot and I needed to find somebody in a hurry that could.
. . . .
Q: Why did you hire [Mr. McLaughlin] as DMIT if he was going into Diane's slot as [D]istrict [M]anager?
A: Because I had the good fortune to get him hired before Diane vacated the position and Lyn authorized the refunding of the DMIT slot.

Depo. Mike Terrell, 70:18–71:2, 71:16–71:23, 72:12–72:15, 73:6–73:12, 74:10–74:16.

Given how clearly Mr. Terrell stated that he rehired Mr. McLaughlin to replace Ms. Scott, Mr. Terrell's affidavit seems inherently inconsistent with his deposition testimony; however, the court notes two facts that suggest that Mr. Terrell's deposition testimony truly was a result of his mistaken recollection.

First, in his deposition, Mr. Terrell never states *when* Ms. Scott told him of her intention to resign. In fact, he states he did not remember the exact chronology of events. *See* Depo. Mike Terrell 128:21–23 ("You know, I don't know at this point in time chronologically exactly when Diane told me that [she was planning on resigning]."). Based on Mr. Terrell's deposition alone, the court can only ascertain that Ms. Scott would have told him she was resigning after Ms. Daugherty was terminated, but before he hired Mr. McLaughlin. This window of time is difficult to believe though, because MAPCO terminated Ms. Daugherty on March 26, 2009 and hired Mr. McLaughlin on April 6, 2009. According to Mr. Terrell's deposition testimony, Ms. Scott must have told Mr. Terrell of her intent to resign within those eleven days, and Mr. Terrell must have hired Mr. McLaughlin during that same time period. As MAPCO points out, that brief time window is clearly inconsistent with *Ms. Scott's* deposition testimony as to when *she* decided to resign:

Q: Okay. So you started thinking about [resigning] somewhere around mid-May?
A: Yes, sir.

19

> . . .
> Q: Did you ever have any conversation with Mike Terrell about your resignation.
> A: No.
> . . . .
> Q: If, if [Mr. Terrell] said that you had told him back in April that you were
> resigning, would that be incorrect?
> A: I don't remember telling anybody. I didn't even know myself. How can I tell
> somebody if I'm not even, I never even thought about quitting until just
> everything got snowballed there. Things were happening at home.

Depo. Diane Scott, 20:22–21:1, 21:16–21:18, 22:3–22:11.

Second, Ms. Daugherty's counsel, when deposing Mr. Terrell, pointed out inconsistencies
with Mr. Terrell's own testimony and e-mails he had sent to other MAPCO employees. One such
e-mail was sent from Mr. Terrell to Ms. Roardarmel, a Vice President of Human Resources,
regarding another former MAPCO employee, Jenia Miller. Ms. Miller was the other employee
Mr. Terrell terminated to reduce overhead while he was acting Division Manager. After MAPCO
terminated Ms. Miller, she saw Mr. McLaughlin working at one of MAPCO's stores. Ms. Miller
contacted Ms. Roardarmel, a human resources executive, and asked how Mr. McLaughlin could
be working as a DMIT when Ms. Miller's position was eliminated. Ms. Roardarmel e-mailed Mr.
Terrell, asking him if he could give her "any back story on this situation" because she wanted "to
be sensitive to anything that might be perceived as gender discrimination." Pl. Ex. 16 to Depo.
Mike Terrell at 3. In his response, sent on April 20, 2012, Mr. Terrell explained, among other
things:

> As to [Ms. Miller]'s position being eliminated, I told her why I was doing so. I
> met privately with each member of the team on the first day that I was acting
> [Division Manager]. . . . [Ms. Miller] informed me that Greg Tate had told her
> that he was hiring her to replace Diane Scott and that "the company" intended to
> fire Diane as soon as her lawsuit was over.
>
> Because I realize that you and the other members of the management team would
> know that action would be illegal, I did not see any point in leading Jenia to think

she would be replacing Diane.

. . . .

With regard to gender discrimination, based on the lineup in Alabama, I would be more concerned about a successful claim being lodged by a male, rather than by a female. At present we have seven DM's. Four are female. Prior to the position changes, there were 6 females and 3 males. [Mr. McLaughlin] was not hired because he is male. He was put in place because he has experience and is willing to move to accept a promotion.

Pl. Ex. 16 to Depo. Mike Terrell at 2. As Ms. Daugherty's counsel noted, Mr. Terrell did not explain in that e-mail that Ms. Scott was resigning and that her resignation had nothing to do with a lawsuit, nor did he reference the vacancy of Ms. Scott's position when he discussed hiring Mr. McLaughlin. *See* Depo. Mike Terrell 117:21–118:1 (questioning, in regards to Mr. Terrell's statement about his response to Jenia Miller, "[w]hy didn't you put something in there that [Ms. Scott] told you she was resigning and it had nothing to do with the settlement of her lawsuit?"); 120:21–22 (questioning, in regards to reasons to Mr. McLaughlin's hiring, "[w]hy did you not reference the vacancy of [Ms. Scott]'s position there?").

Although Mr. Terrell responded that he did not see a reason why he needed to explain that Ms. Scott was resigning to Ms. Roardarmel, the court questions whether Mr. Terrell truly was confused about the chronology of events when he gave his deposition. This confusion is consistent with his affidavit, where he states that he was "clearly mistaken in his recollection."

The court is mindful that on a motion for summary judgment, it must refrain from weighing the evidence and making credibility determinations. It further notes that the inconsistencies noted—*e.g.* the differences between Mr. Terrell's deposition, and the e-mails that Mr. Terrell sent and Ms. Scott's contrary testimony—do not negate the genuine issues of fact raised by Mr. Terrell's deposition testimony. And the court agrees with Ms. Daugherty that Mr.

21

Terrell's affidavit appears to "represent a complete about-face" from his deposition testimony on some of the important issues in this case.

The court, however, also notes that the one case Ms. Daugherty cited where a court struck a "sham" affidavit involved a plaintiff-party attempting to create a genuine issue of material fact by submitting an affidavit contradictory to deposition testimony. *See Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 ("When a party has given clear answers to unambiguous questions which *negate* the existence of any genuine issue of material fact, that party cannot thereafter *create* such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.") (emphasis added).

In this case, MAPCO does not offer Mr. Terrell's affidavit to create a genuine issue of material fact in its presentation of the facts—which would defeat its motion for summary judgment—and cites to the affidavit only once when addressing the merits of Ms. Daugherty's Title VII claim. Moreover, because MAPCO does not need to only raise a genuine issue of material fact to survive summary judgment, but instead bears the heavier burden of showing that *no* such issues exist, Mr. Terrell's affidavit was of limited applicability because the court considered all evidentiary materials submitted—including Mr. Terrell's entire deposition testimony—when determining whether to grant summary judgment. While a plaintiff who submits an affidavit directly contradicting deposition testimony may raise a genuine issue of material fact and survive summary judgment, a defendant that does the same risks creating genuine issues of material fact that will cause it to lose on its motion for summary judgment. In this case, Mr. Terrell's affidavit neither creates genuine issues of material fact nor negates them, but explains the confusion witnesses frequently have with time sequences.

Accordingly, the court DENIES Ms. Daugherty's motion to strike Mr. Terrell's affidavit. In doing so, the court emphasizes that it did not need to consider Mr. Terrell's affidavit to determine that MAPCO is entitled to summary judgment. As the court will explain below, it grants Ms. Daugherty's motion for summary judgment based on the release she signed as part of her severance package, which the court concludes was signed knowingly and voluntarily and was not fraudulently procured. In doing so, the court does not reach the merits of Ms. Daugherty's claim.

## IV.   DISCUSSION

As part of Ms. Daugherty's severance package, she signed an agreement explaining that she was agreeing to discharge and release MAPCO from claims arising out of her employment with MAPCO, whether known or unknown at the time Ms. Daugherty signed the release. The release specifically included claims under Title VII, but specifically exempted any claims that may arise after she signed the document. The agreement gave Ms. Daugherty twenty-one days in which to consider entering into the agreement, including an acknowledgment that she had the opportunity to read the agreement and seek legal advice. Under the agreement, she had seven days to revoke the agreement after the date she signed it. The agreement also included a choice-of-law provision, stating that it would be "governed by and construed in accordance with the laws of the State of Tennessee." Ex. G to Def. Br. S.J. ¶ 14.

Before addressing Ms. Daugherty's argument that the release is invalid, the court will first address the parties' disagreement over what law applies to Ms. Daugherty's challenge to the validity of the release.

23

A.    *Law governing the release*

The release states that it "shall be governed by and construed in accordance with the laws of the State of Tennessee and without regard to any rule of construction under which any agreement may be construed against the drafter or any rule regarding conflicts of law." Ex. G to Def. Br. S.J. Moreover,  as a general rule, federal law governs the validity of Title VII waivers. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir. 1990). Thus, MAPCO argues that because the contract has a Tennessee choice-of-law provision, Sixth Circuit law applies to the release. Ms. Daugherty disagrees, stating that the cases MAPCO cited, which explain that federal law controls the release of Title VII claims, have "no choice-of-laws aspect to them and thus provide no reason not to apply the law of the forum." Pl. Opp. Br. at 13. The court concludes that Eleventh Circuit law should apply when determining whether the release should be invalidated for fraudulent inducement, but for a different reason than that advanced by Ms. Daugherty.

Neither party cited a case explaining how choice-of-law provisions in releases of Title VII claims are applied to attacks on the validity of those releases *ab initio*. To find an answer to this question, the court turned to the *Restatement (Second) of Conflict of Laws* (1971). Under the *Restatement*, "[a] choice-of-law provision, like any other contractual provision, will not be given effect if the consent of one of the parties to its inclusion in the contract was obtained by improper means, such as by misrepresentation, duress, or undue influence, or by mistake." *Restatement (Second) of Conflict of Laws*, § 187, cmt. b. Thus, "[w]hether such consent was in fact obtained by improper means or by mistake will be determined by the forum in accordance with its own legal principles." *Restatement (Second) of Conflict of Laws*, § 187, cmt. b.

The court agrees with the rationale behind the Restatement—specifically, that choice-of-

law clauses should not apply if the contract itself was not validly executed. If a party to a contract

was fraudulently induced to sign it, such that the terms of the contract should not be enforceable,

then logically the choice-of-law provision, which is a term of that contract, is no longer capable of

enforcement either. Other courts have interpreted this section of the Restatement similarly. *See*

*Del Bosque v. AT&T Advertising*, *L.P.*, 441 Fed. Appx. 258, 260 (5th Cir. 2011) ("The presence

of a choice-of-law provision in the settlement agreement itself logically cannot control our

resolution of [the enforceability of the agreement], inasmuch as the issue to be resolved is the

validity of that very agreement . . . .") (citing *Restatement (Second) of Conflict of Laws*, § 187

cmt. b); *Aces Transp.*, *Inc.*, *v. Ryan Transp. Servs*, *Inc.*, 2006 U.S. Dist. LEXIS 98963, at *14 (D.

Kan. May 24, 2006) ("[T]he merits of [the plaintiff]'s rescission claim, which is a challenge to the

validity of the agreement itself, must be resolved before the court can determine whether . . .

choice-of-law provision in the agreement is enforceable."); *It's Just Lunch Intl.*, *LLC*, *v. Polar

Bear Inc.*, 2004 U.S. Dist. LEXIS 30506, at *6 (S.D. Cal. Apr. 27, 2004) ("[Section] 187 provides

that conflict of law principles should not be used to give effect to a choice of law provision where

the validity of the agreement containing the provision has been challenged. . . . Thus, if a court is

faced with a challenge to a contract's validity, before the court can apply a choice of law provision

it must determine whether the agreement containing the clause is invalid under [the law of the

forum state].").

　　　　Even if the court were to enforce the choice-of-law provision, the outcome would not

change, because both Eleventh Circuit and Sixth Circuit law apply substantially similar standards

in addressing the validity of waivers of Title VII claims, as discussed below. Alabama and

Tennessee state laws are also similar regarding a claim of fraudulent inducement. *Compare*

*Brushwitz v. Ezell*, 757 So. 2d 423, 429 (Ala. 2000) ("The elements of fraud are: (1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate consequence.") *with Dobbs v. Guenther*, 846 S.W.2d 270, 274 (Tenn. Ct. App. 1992) ("Actions for fraud contain four elements: (1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, and (3) an injury caused by reasonable reliance on the representation. The fourth element requires that the misrepresentation involve a past or existing fact or, in the case of promissory fraud, that it involve a promise of future action with no present intent to perform.").

B.    *Ms. Daugherty's claim is covered by the release, if the release is valid*

The severance agreement expressly exempts any claims that arise *after* the agreement is executed. Ms. Daugherty argues that her claim arose after her termination, when MAPCO hired Mr. McLaughlin to replace her. Before determining the validity of the release, the court must address this threshold issue, because if Ms. Daugherty's claim is exempted from the scope of the release, any discussion on the validity of the release is moot.

Title VII states that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Under this statute, the unlawful employment practice is the discriminatory *discharge*. The replacement by a member outside the protected class is only circumstantial evidence of discrimination, but is not itself the discriminatory act. As the Supreme Court has explained, "[the] proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." *Del. St. College v. Ricks*, 449 U.S. 250, 258

26

(1980) (alterations and emphases in original) (quoting *Abramson v. U. of Haw.*, 594 F.2d 202, 209 (1979)); *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1263 (11th Cir. 2003); *see Brunet v. City of Columbus*, 1 F.3d 390, 402 (11th Cir. 1993) ("[T]he cause of action accrues upon the happening of the discriminatory act, even if the effects of the discriminatory act are not felt until a later time.") (citing *Del. St. College v. Ricks*, 449 U.S. at 248).

Most cases that discuss when a Title VII or ADEA cause of action accrues do so in the context of when the statute of limitations begins to run. For example, the Eleventh Circuit in *Jones v. Dillard* confirmed that the statute of limitations begins to run when the discriminatory act occurs, but explained the statute of limitations could be equitably tolled "to close the loophole used by the malicious employer to avoid age discrimination liability." *Jones*, 331 F.3d at 1264 (citing *Reeb v. Econ. Opportunity Atlanta, Inc.*, 516 F.2d 924, 930 (5th Cir. 1975)). But the very reason why *Jones* and other similar cases apply equitable tolling is to mitigate against the harsh and inequitable effects that would sometimes occur if courts rigidly adhered to starting the statute of limitations on the date when the claim actually arose. In this case, the equitable concerns cited by the Eleventh Circuit are not present. MAPCO is not arguing that Ms. Daugherty's claim is foreclosed by a statute of limitations to which she is passively subjected, but by a release that she knowingly and voluntarily executed.

The parties have acknowledged the scarcity of cases discussing when a claim arises for purposes of determining whether it falls within the scope of a release, and most of the cases cited by the parties address whether the statute of limitation could be equitably tolled. Only Ms. Daugherty cited cases, all from the Seventh Circuit, discussing when a claim arises for purposes of a release. In particular, she relies on language from a case stating that "a general release is valid

as to all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry." *Fair v. Intl. Flavors & Fragrances*, 905 F.2d 1114, 1116 (7th Cir. 1996).

But the Seventh Circuit noted in a later case, in which it cited *Fair*, that "[i]n release cases, the question is not when was the date of accrual [as in statute of limitations cases], but rather whether the plaintiff is knowingly giving up the right to sue on some claims, or all claims that are in general terms predictable." *Wagner v. Nutrasweet Co.*, 95 F.3d 527, 533 (7th Cir. 1996). Thus, the Seventh Circuit held that "[w]hen a release is broadly worded, as this one was, to cover all claims, 'known and unknown,' the plaintiff is giving up the right to sue that she might otherwise have on claims related to her employment that could arise under any law. The waiver is valid if it is knowing and voluntary . . . ." *Wagner*, 95 F.3d at 533. The Seventh Circuit found unavailing the plaintiff's argument that the release did not cover claims that she could not have known about at the time she signed the release—specifically, that her male successor received much higher bonuses for comparable work—and affirmed summary judgment for the defendant based on the release. *Wagner*, 95 F.3d at 533.

The court agrees with the decision in *Wagner* that the question is not when the claim accrues under the release, but whether the release is valid. If Ms. Daugherty can successfully challenge the validity of the release, she could maintain her claim. If she cannot invalidate the release, her claim is foreclosed because the discriminatory act occurred before she signed the severance agreement—when she was terminated, whether she knew or did not know that she had a claim.

28

C.      *Validity of the release under Eleventh Circuit and Alabama law*

Ms. Daugherty executed the release knowingly and voluntarily

        In both the Eleventh and Sixth Circuits, an employee is bound by an agreement releasing

an employer from Title VII liability when she does so knowingly and voluntarily. *Puentes v. UPS*,

86 F.3d 196, 198 (11th Cir. 1996); *Adams v. Philip Morris*, 67 F.3d 580, 583 (6th Cir. 1995).

Because the release at issue in this case constitutes a waiver of a remedial right, it must be closely

scrutinized. *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1352 (11th Cir. 1983). In

determining whether a waiver is knowingly and voluntarily executed, the Eleventh Circuit looks

to the totality of the circumstances, guided by the following factors: (1) the plaintiff's education

and business experience; (2) the amount of time the plaintiff considered the agreement before

signing it; (3) the clarity of the agreement; (4) the plaintiff's opportunity to consult with an

attorney; (5) the employer's encouragement or discouragement of consultation with an attorney;

and (6) the consideration given in exchange for the waiver when compared with the benefits to

which the employee was already entitled. *Puentes*, 86 F.3d at 198.

        Although the Sixth Circuit states that it applies "ordinary contract principles in

determining whether a Title VII waiver is valid," it also applies a multi-factor test to determine

whether the release has been knowingly and voluntarily executed. *See Adams*, 67 F.3d at 583 ("In

evaluating whether a release has been knowingly and voluntarily executed, we look to (1)

plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to

consider whether to sign the waiver, including whether the employee had an opportunity to

consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5)

the totality of the circumstances."). Because no meaningful difference exists between the Eleventh

29

Circuit and the Sixth Circuit on the standard applied to challenging the validity of Title VII claims, no true conflict exists, and the court will apply Eleventh Circuit law in its analysis.

The court concludes that the knowing and voluntary factors from *Puentes* favor MAPCO's argument that Ms. Daugherty knowingly and voluntarily executed the release and waiver of her Title VII claims. First, Ms. Daugherty had thirteen years of experience working for Williamson Oil and then MAPCO, during which time she held multiple managerial positions. In addition to her work for MAPCO, she had also obtained a two year degree from a community college, a license as a real estate agent, and certifications in real estate appraisal and health information technology. Thus, the court concludes that she had sufficient education and business experience to understand the release.

Second, the agreement gave Ms. Daugherty twenty-one days to consider signing the agreement, with a seven day revocation period. Ms Daugherty has not offered any evidence to show that she was pressured into hastily executing the agreement. *See Puentes*, 86 F.3d at 199 (finding that giving employees only twenty-four hours to decide whether they would sign releases and accept severance packages was a factor raising a genuine issue of material fact about whether the plaintiffs knowingly and voluntarily executed their releases). In fact, Ms. Daugherty testified that she took the severance agreement home and talked it over with her husband before she decided to sign the agreement.

Third, the agreement was sufficiently clear, and specifically explained that Ms. Daugherty was releasing her Title VII claims, whether *known or unknown*, against MAPCO. Fourth, Ms. Daugherty offers no evidence that MAPCO did not give her ample time to consult with an attorney. Ms. Daugherty also testified in deposition that she understood she had the right to

discuss the document with a lawyer and voluntarily decided not to do so.  Fifth, although MAPCO did not expressly encourage Ms. Daugherty to consult with an attorney, the agreement included an acknowledgment that she had the opportunity to read and review the agreement and to seek legal advice.

Sixth, Ms. Daugherty negotiated a more generous severance package than she was originally offered. MAPCO initially offered her only three months severance, but later raised the severance package to six months of her base salary after Ms. Daugherty spoke with Ms. Roardarmel, Vice President of Human Resources. Ms. Daugherty's total severance pay was $21,629.94. Although the increase in severance pay was not given expressly as consideration for the waiver and release, the record is unclear as to whether MAPCO even had to offer the three month severance package. *See* Pl. Ex. 18 to Depo. Mike Terrell (e-mail dated March 24, 2009 from Mr. Terrell to other MAPCO employees, stating that "Kathy Roadarmel wants to pay [Ms. Daugherty and Ms. Miller] 3 months severance. Although I would not be that generous, her point is valid in that we should be uniform throughout the company and fortunately, I am proud to say, I was able to influence them to get away from the McLarty 2 week package in favor a [*sic*] standard 3 month package"). The fact that MAPCO doubled Ms. Daugherty's package—giving her over $10,000 more than she would have otherwise received—favors a finding that she knowingly and voluntarily executed her waiver and release and that she received consideration for the waiver.

Fraudulent inducement may be raised as a defense to releases of Title VII waivers

Ms. Daugherty, in responding to MAPCO's motion for summary judgment, did not argue that any of these factors indicated that her waiver and release was not knowing and voluntary. Instead, she dismissed MAPCO's argument that her release was executed knowingly and

voluntarily as "all besides the point," stating that because none of the cases MAPCO cited discussed fraudulent inducement, "they are all irrelevant." Pl. Opp. Br. at 13.  Ms. Daugherty argues that the relevant analysis to undertake is whether she was fraudulently induced to sign the release. Under that analysis, Ms. Daugherty argues that she has presented substantial evidence from which a reasonable fact-finder could conclude MAPCO fraudulently induced Ms. Daugherty into executing the release.

MAPCO responds that the only inquiry for this court is whether Ms. Daugherty knowingly and voluntarily executed the waiver and release, implying that the "knowing and voluntary" standard inherently addresses fraud, duress, or coercion. According to MAPCO, "a 'fraud' contention may only undo the executed waiver if it was made within the four corners of the document itself." Def. Br. S.J. at 17.

Both parties raise valid points, and neither the Eleventh Circuit nor the Sixth Circuit have foreclosed challenges to Title VII waivers under a theory of fraudulent inducement, although neither Circuit has allowed a plaintiff to raise such a defense. The Eleventh Circuit, however, has allowed plaintiffs to raise fraudulent inducement as a waiver to ADEA rights, a conclusion it reached by interpreting the Older Workers Benefit Protection Act ("OWBPA"). *See Griffin v. Kraft Gen. Foods*, *Inc.*, 62 F.3d 368 , 373–74 (11th Cir. 1995) ("nonstatutory circumstances, such as fraud, duress, or coercion in connection with the execution of the waiver, may render an ADEA waiver not 'knowing and voluntary.'"). As one commentator has noted, the purpose of the OWBPA was to prevent "unfair and abusive" waiver practices, including, specifically, "waiver[s] of ADEA rights by older workers without any information necessary to assess whether their terminations were based on age." Richard J. Lussier, *Title II of the Older Workers Benefit*

32

*Protection Act: A License for Age Discrimination? The Problem Identified and Proposed Solutions*, 35 Harv. J. on Legis. 189, 193–94 (1998) (citing Sen. Rpt. 101-79 at 9–12 (1989)). Given the kinship between the ADEA and Title VII and the remedial nature of both statutes, one *could* conclude that the logic that employees should be making fully informed decisions would also apply to Title VII waivers, notwithstanding the lack of an equivalent to the OWBPA for Title VII waivers. *See McKelvy v. Metal Container Corp.*, 854 F.2d 448, 451 n. 5 (11th Cir. 1988) (explaining that the logic of Title VII cases was equally applicable in the ADEA context "because of the near identity of the statutes").

MAPCO, however, also raises a valid point when it argues that even if Ms. Daugherty did not realize until after she executed the severance agreement that MAPCO's reason for her termination was untruthful, "that is the risk she took with the bargain she struck." Def. Br. S.J. at 19. Moreover, Title VII cases, which require proof of actual knowledge and real intent, *see Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001), are often impossible to defend at the pleading stage. Because an employer may be required to spend substantial resources defending a case through summary judgment, even where the employer had an iron-clad legitimate, nondiscriminatory reason for firing an employee, the employer has a justifiable interest in avoiding lawsuits in exchange for substantial consideration, like the six-month severance package paid in this case. Just as the employee takes a risk with signing a release in exchange for a generous severance package by waiving unknown claims, so does the employer take a risk by paying the employee more than it had to when the employee might never have sued absent the release. Thus, the court appreciates MAPCO's argument that an analysis of the validity of a contract should center on whether it was knowing and voluntary, and not on whether Ms.

Daugherty must be provided "'perfect knowledge' of all facts and circumstances" relating to her employment.

Whether Ms. Daugherty may raise fraudulent inducement as a challenge to the validity of the release and waiver, when that waiver is knowing and voluntary under the *Puentes* factors, is academic under these facts, however. Even if the court considers her fraudulent inducement challenge to the validity of the release, Ms. Daugherty has failed to provide sufficient evidence for a reasonable jury to conclude that MAPCO fraudulently induced her to sign the release and waiver.

<u>Ms. Daugherty does not provide sufficient evidence for a reasonable fact-finder to find fraudulent inducement</u>

When a plaintiff challenges a release of discrimination claims, arguing fraudulent inducement, the court applies state law. *See Raybon*, 160 Fed. Appx. 926, 928 (11th Cir. 2005) (applying Alabama law to a claim that a plaintiff was fraudulently induced to sign a release of his ADEA claims). Under Alabama law, "[t]he elements of fraud are: (1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate consequence." *Raybon*, 160 Fed. Appx. at 927 (quoting *Brushwitz*, 757 So. 2d at 429). "A 'material fact' is a fact that would reasonably induce someone to act," *Fraser v. Reynolds*, 588 So. 2d 442, 446 (11th Cir. 1990), and "the false representation must concern a material *existing* fact." *Tallant v. Grain Mart*, 432 So. 2d 1251, 1254 (Ala. 1983) (emphasis added).

In arguing fraudulent inducement, Ms. Daugherty claims that she executed the severance agreement in reliance on misrepresentations Mr. Terrell allegedly made in the letter, which she claims was the only source of information she received as to why she was being terminated. Mr.

34

Terrell told Ms. Daugherty that her position was being eliminated for two reasons: first, because

he was directed to reduce "a significant amount of salary dollars from the division overhead

budget" to partially fund the new Director of Operations East position; and second, because Ms.

Daugherty was not willing to move, and that "[i]n light of that restriction, especially in view of the

fact that there is very little chance of a DM position opening up in or near [Ms. Daugherty's] area

of residence," she was of limited utility to MAPCO. Ex. D to Def. Br. S.J.

 Ms. Daugherty asserts that these reasons were not true. She contends that Mr. Terrell had

already hired Mr. McLaughlin as DMIT to be ready to take over Ms. Scott's district; that Mr.

Terrell had only asked her to move to Tennessee; that MAPCO keeps repeating a "'she won't

move' mantra" when it has no official policy requiring DMITs to be willing to move; and that Ms.

Daugherty did not need to move because Mr. Terrell knew Ms. Scott was leaving before he fired

Ms. Daugherty. Pl. Opp. Br. at 18.

 The evidence does not support Ms. Daugherty's contentions. First, as to her contention

that Mr. Terrell hired Mr. McLaughlin before MAPCO terminated Ms. Daugherty—based on

MAPCO's Personnel Action Form that has Mr. McLaughlin's hire date typed as March 6, 2009—

the court does not view the form as creating a genuine dispute that he was rehired before Ms.

Daugherty was terminated. Ms. Daugherty argues that viewed in the light most favorable to her,

the court must *assume* Mr. McLaughlin was rehired before Ms. Daugherty was terminated. Ms.

Daugherty, however, "need not be given the benefit of every inference but only of every

*reasonable* inference." *Graham*, 193 F.3d at 1282 (emphasis added). Because she offers no

evidence to corroborate that Mr. McLaughlin was hired before April, and because the e-mails

between MAPCO employees produced during discovery and the deposition testimony produced in

this case all indicate Mr. McLaughlin was hired in April, no genuine dispute exists that Mr. McLaughlin was hired after Mr. Daugherty was terminated. Mr. McLaughlin's hiring, thus, does not make any statement in Ms. Daugherty's termination letter a misrepresentation.

The court also concludes that Ms. Daugherty's contention that Mr. Terrell asked her if she would move to *Tennessee* does not make the letter a misrepresentation, much less a willful misrepresentation. The termination letter clearly states that Ms. Daugherty indicated she would accept a promotion to District Manager "only if [she] did not have to move." Ex. D to Def. Br. S.J. The letter does not further qualify this sentence with a geographical limitation. Moreover, when Ms. Daugherty received the termination letter, and before she signed the severance agreement, she asked Ms. Roardarmel to make some changes to the letter. *See* Depo. Darlene Daugherty 122:17–123:18; Pl. Ex. 3 to Depo. Mike Terrell. Even if Mr. Terrell asked Ms. Daugherty if she would move to Tennessee when he met with her individually, he was not so specific in his termination letter, and she did not ask to have that specificity included when she suggested revisions to the letter. Because Ms. Daugherty argues that "[t]he letter was the only source of information [Ms.] Daugherty received as to why she was being terminated," Pl. Opp. Br. at 18, the court must examine whether *the letter* contains the material misrepresentation that Ms. Daugherty claims she reasonably relied upon, and not what Mr. Terrell may have said in his individual meeting with Ms. Daugherty. The fact that MAPCO acquiesced to her suggested modifications of that letter belies her reliance on its unqualified language regarding her willingness to move.

Ms. Daugherty also quarrels with MAPCO using her unwillingness to move as a reason for her termination, asserting that MAPCO had no policy requiring DMITs to be willing to move. But

36

none of the elements of fraud require that MAPCO had to have followed an official policy in explaining its reason for terminating her. Indeed, Title VII cases do not even require reasons for adverse employment actions to be pursuant to official policy; the reason only needs to be legitimate and nondiscriminatory. *See Damon v. Fleming Supermarkets of Fla.*, *Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law . . . . [O]ur sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.") (internal quotations omitted). Here, MAPCO had a legitimate and nondiscriminatory reason for terminating Ms. Daugherty, because if a District Manager positioned opened far from her residence, even in Alabama, and she were unwilling to move to take the position, the funds used to train her would have been wasted. All deponents questioned about whether MAPCO had such a policy, besides Ms. Daugherty, acknowledged that DMITs should be willing to move to accept a promotion, even if MAPCO had no official policy on that issue. *See* Depo. Mike Terrell 34:18–35:11 Depo. Diane Scott, 26:15–26:23; Depo. Lyn Gregory 12. And even if her unwillingness to move, whether to Tennessee or elsewhere, was not a legitimate reason for terminating her, she has not shown that MAPCO made a misrepresentation to her by stating this reason in the termination letter. MAPCO could have told her that it was firing her because it needed to reduce overhead and she rooted for the wrong football team, and as long as that reason were true, it would not be a misrepresentation of a material fact.

Finally, the court addresses Ms. Daugherty's final and most crucial assertion: that her unwillingness to move was not a reason for her termination because Mr. Terrell knew Ms. Scott was leaving before he terminated Ms. Daugherty. If the evidence, viewed in the light most

favorable to Ms. Daugherty, showed that Mr. Terrell had this knowledge, it would at least raise a

jury question as to whether he willfully made a misrepresentation of a material fact. The evidence

Ms. Daugherty has presented, however, is insufficient to allow a reasonable fact-finder to

conclude that Mr. Terrell *knew* Ms. Scott was resigning before Ms. Daugherty was terminated.

Nowhere in Mr. Terrell's deposition does he state that he knew or suspected that Ms. Scott would

leave before he fired Ms. Daugherty. *See* Depo. Mike Terrell 73:9–73:15 (answering that he did

not know about Ms. Scott's resignation until after Ms. Daugherty left); 75:23–76:4 ("Q: So before

[Ms. Daugherty] left the company, you were never made aware of Diane's plans to leave? A: I did

not know she was going to leave, no."). In fact, although Mr. Terrell's testimony is inconsistent

and confused in other respects, his testimony is consistent on this point and accords with Ms.

Scott's testimony in that both testified that Ms. Scott did not indicate she would resign until after

Ms. Daugherty was terminated. *See* Depo. Diane Scott 20:14–22:11. If Mr. Terrell did not know

that Ms. Scott was resigning before he fired Ms. Daugherty, he did not make a misrepresentation

of an *existing* material fact, as required to allege fraud. *See Tallant*, 432 So. 2d at 1254.

The only evidence Ms. Daugherty has offered to prove that Mr. Terrell was making a

misrepresentation of a material fact when he stated that "there is very little chance of a DM

position opening up in or near your area of residence" is that Mr. Tate was "grooming [her] to

take over [Ms. Scott's] position," Depo. Darlene Daugherty 85:11–12, and that in November or

December of 2008 or January of 2009, she was at a dinner where she heard Mr. Terrell say to Mr.

Tate that "Diane Scott would not be around much longer and that they would not have to worry

about her." 2d Decl. Darlene Daugherty ¶ 4. Even assuming that these statements raised a *genuine*

dispute of fact as to whether Mr. Terrell suspected that Ms. Scott might leave because of her

lawsuit in late 2008 or January 2009, they do not rise to the level of making Mr. Terrell's statement in the termination letter in late March, 2009 a willful misrepresentation of a material fact. *Cf.* Pl. Ex 18 to Depo. Mike Terrell at 2 (e-mail dated March 24, 2009 from Mr. Terrell to other MAPCO employees stating that he was "shocked" at Ms. Miller's statement Mr. Tate had told her that MAPCO intended to fire Ms. Scott for filing a lawsuit, and explaining that "[e]veryone in a decision making capacity at the corporate office would know Diane is protected from termination for that reason").

Moreover, Ms. Daugherty places herself in a "Catch-22" situation by offering evidence that Mr. Terrell suspected that Ms. Scott would be leaving because that evidence implies that Ms. Daugherty also had knowledge of Ms. Scott's potential impending departure. The only evidence that could prove that Mr. Terrell would willfully misrepresent the material fact that a District Manager position had little chance of opening near Ms. Daugherty was information that was common knowledge to both Ms. Daugherty and Mr. Terrell. In other words, if Ms. Daugherty knew that employees at MAPCO believed that Ms. Scott would either be fired or leave because of her lawsuit, and if she knew that Mr. Terrell had told Mr. Tate that Ms. Scott would not be around much longer, Ms. Daugherty's reliance on the termination letter in signing her severance agreement would be unreasonable. *See Raybon*, 160 Fed. Appx. at 928 ("explaining that "even if [the Court] were to assume that a misrepresentation occurred, the plaintiff's reliance on it was not reasonable," because at the time he signed his separation agreement, he had sufficient notice that his job had not been eliminated). By requesting revisions to the letter, Ms. Daugherty demonstrated that she read the letter critically, and that she had the opportunity to contest the statements made within the letter, including the statement about the low likelihood of a District

Manager position opening near her. Thus, if the evidence she offers to prove that Mr. Terrell made a willful misrepresentation would be sufficient to create a genuine dispute of a material fact, then that evidence would also be sufficient to show that her reliance on that representation was unreasonable.

Accordingly, the court concludes that Ms. Daugherty has failed to establish a *genuine* issue of a fact *material* to her claim that MAPCO fraudulently induced her to sign the severance agreement. Because the court determines that she *knowingly* and *voluntarily* executed the agreement under the totality of the circumstances, including the circumstances she raised outside the *Puentes* factors, the court concludes that the release is enforceable against her and precludes her Title VII claim, regardless of what its merits may be.

D.      *MAPCO's request for the attorneys' fees provided for in the release*

In its conclusion to its summary judgment brief, MAPCO requests an award of costs and attorneys' fees, citing a provision in the severance agreement that provides that "[t]he prevailing party in any litigation brought to enforce the terms of this agreement shall be entitled to recover, in addition to any and all other remedies available to it, its reasonable attorneys' fees and costs incurred in the litigation." Ex. G Def. Br. S.J. ¶ 14.

The court recognizes the hardship to employers by allowing a case to proceed through discovery when an employee has signed a release in exchange for valuable consideration. But given the remedial nature of the Title VII statutes, and the close scrutiny given to waivers of these remedial rights, the court concludes that enforcing the attorneys' fee provision *in this case* would be akin to requiring an employee challenging such waivers to tender back the consideration she receives for that waiver—a requirement that the Eleventh Circuit has found incongruous with the

general policy of the ADEA. *See Forbus v. Sears Roebuck & Co.*, 958 F.2d 1036,1041 (11th Cir. 1992) (finding that the tender back doctrine should not apply to ADEA claims because it is a "remedial statute designed to protect employees.") The court finds, similarly, that the attorneys' fees provision in the release would be incongruous with the policy of Title VII, also a remedial statute designed to protect employees. Although the court has found, at the close of discovery, that Ms. Daugherty has no basis for her claim of fraudulent inducement, the court notes she had no way of knowing whether MAPCO misrepresented its reasons for terminating her until she initiated this lawsuit.

## V.    CONCLUSION

For the reasons stated above, the court GRANTS Defendant MAPCO's motion for summary judgment and ENTERS JUDGMENT in MAPCO's favor and against Plaintiff Darlene Daugherty as to her sole Title VII claim. The court further DENIES MAPCO's request for attorneys' fees as requested in its brief in support of its motion for summary judgment. The court, however, will tax costs against the plaintiff. The court will simultaneously enter an order to this effect.

DONE and ORDERED this 19th day of June, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

41